UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK,
-----------------------------------------------------------------------x
EKMAN & CO AB,

                              Plaintiff,

   –against –

GRAPHIC PAPER, INC.,

                              Defendant.
-----------------------------------------------------------------------x
GRAPHIC PAPER, INC.,

                              Interpleader Plaintiff,

   -against-

EKMAN & CO. AB, and
U.S. BANK NATIONAL ASSOCIATION,

                              Interpleader Defendants.
-----------------------------------------------------------------------x

Case No. 10 CV 8110 (JGK)

## PLAINTIFF-INTERPLEADER DEFENDANT EKMAN & CO AB'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, plaintiff-interpleader defendant Ekman & Co AB ("Ekman AB")  submits the following Statement of Undisputed Material Facts in support of its motion for partial summary judgment against interpleader defendant U.S. Bank, N.A. ("U.S. Bank") and defendant-interpleader plaintiff Graphic Paper, Inc. ("Graphic"):

**The Parties**

1.	Ekman AB is incorporated under the laws of Sweden with its principal offices located at Lilla Bommen 1, Gothenburg, Sweden. [Dkt.[1] No. 1, ¶ 3].

2.	Ekman AB is engaged in, among other things, the business of purchasing certain forestry products and reselling such goods to its customers at a profit. [Dkt. No. 1, ¶ 3].

3.	Ekman AB has operated for over 200 years. [Decl. of Anthony J. Costantini, Ex. A, Ex. G (Dep. of Rosane Guterro, p. 62 ln. 7-12)].

4.	Ekman AB is owned by its employees as well as by members of the Ekman family. [Decl. of Anthony J. Costantini, Ex. A].

5.	U.S. Bank is a national banking association with its principal place of business in the State of Minnesota. [Dkt. No. 21, ¶ 4].

6.	Graphic is a corporation organized under the laws of the State of New York [Dkt. No. 13, ¶ 1].

**The Transactions Between Ekman AB and Graphic**

7.	Graphic was approached by Paper Max, Inc., ("Paper Max") for the purpose of selling to Graphic certain paper that Graphic was interested in buying. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 37 ln. 24 – p. 38 ln. 4), Ex. J (Dep. of Leonard Aronica, p. 48 ln. )].

8.	No evidence exists of an affiliation between Paper Max and APP. [Decl. of Anthony J. Costantini, Ex F (Dep. of Tim Sung, p. 10 ln. 10 – p. 11 ln. 6), Ex. J (Dep. of Leonard Aronica, p. 21 ln. 8-13, p. 33 ln. 1-16)].

---

[1] References to "Dkt." refer to the Court's docket entries for this action.

9. The paper in question was sold by Great Champ Trading Co. ("Great Champ"). [Decl. of Anthony J. Costantini, Ex F (Dep. of Tim Sung, p. 37 ln. 24 – p. 38 ln. 4)].

10. No evidence exists of an affiliation between Great Champ and APP. [Decl. of Anthony J. Costantini, Ex F (Dep. of Tim Sung, p. 48 ln. 3-24), Ex. J (Dep. of Leonard Aronica, p. 207 ln. 12-25).

11. Based upon its independent investigation, Ekman AB believes that Great Champ is a Hong Kong trading company which had access to the quality of paper required by Graphic. [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 36, ln. 2-21), Ex. M (Dkt. 1, Ex. B, ¶ 8)].

12. Pursuant to an agreement between Paper Max and Great Champ, Paper Max was paid a commission by Great Champ on all orders placed with Great Champ which were originated by Paper Max. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 41 ln. 23 – p. 43 ln. 17, p. 79 ln. 10 – p. 81 ln. 1, Exs. 2 & 3)].

13. Although Graphic wanted to purchase the paper, it was unable or unwilling to post the Letter of Credit required by Great Champ, or to pay for the goods in cash. [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 32 ln. 24-25, p. 17, ln. 7-20), Ex. J (Dep. of Leonard Aronica, p. 21 ln. 14 – p. 22 ln. 2)].

14. Paper Max suggested that Graphic use a broker to finance specific transactions, and suggested a number of possibilities, including Ekman AB. [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 33, ln. 1-11), Ex. J (Dep. of Leonard Aronica, p. 22 ln. 21 – p. 23 ln. 12)].

15. Graphic did in fact use Ekman AB to finance several of its purchases of paper from Great Champ.  [Decl. of Anthony J. Costantini, Ex. J (Dep. of Leonard Aronica, p. 47 ln. 23 – p. 48 ln. 8)].

16. Graphic used other brokers to finance others of its purchases of paper from Great Champ.  [Decl. of Anthony J. Costantini, Ex. J (Dep. of Leonard Aronica, p. 47 ln. 23 – p. 48 ln. 8, p. 98 ln. 16-17, p. 99 ln. 8-10, p. 122 ln. 24 – p. 123 ln. 15)].

17. The "insertion" of Ekman AB as financier was done at <u>Graphic's</u> request, so that <u>Graphic</u> would be able to purchase goods it would not have otherwise been able to purchase.  [Decl. of Anthony J. Costantini, Ex. J (Dep. of Leonard Aronica, p. 21 ln. 14 – p. 22 ln. 16)].

18. Between 2008 and 2010, Ekman AB and Graphic entered into a number of separate transactions for the purchase of paper.  [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 17, ln. 7-20), Ex. K (Dep. of Hans Tidebrant, p. 33 ln. 17-23)].

19. Ekman AB performed a thorough credit review of Graphic, since Graphic would be the entity that would be extended credit by Ekman AB.  [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 135 ln. 3-14), Ex. J (Dep. of Leonard Aronica, p. 56 ln. 2 – p. 57 ln. 2)].

20. Purchasing product through a trading company, rather than directly from the manufacturer of the product, is common in many parts of the world, including Asia.  [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 33 ln. 12-19), Ex. K (Dep. of Hans Tidebrant, p. 12 ln. 19 – p. 13 ln. 14)].

21. In administering the Graphic transactions, Ekman AB enlisted the assistance of several Miami-based employees of its wholly-owned subsidiary, Ekman & Co Inc.  [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 56 ln. 4-25)].

22. These employees, though employed by the subsidiary, acted directly on behalf of Ekman AB in Ekman AB's transactions with Graphic. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 56 ln. 4-25)].

23. Graphic and Paper Max would negotiate a tentative price at which Graphic could purchase paper of a certain quality and quantity (collectively, the "Paper"). [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 152 ln. 8-25)].

24. The tentative price would include costs of financing and freight, among other expenses. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 60 ln. 14-19), Ex. G (Dep. of Rosane Guterro, p. 136 ln. 22 – p. 137 ln. 5, p. 201 ln. 4-11, p. 153 ln. 13-17)].

25. After Graphic and Paper Max agreed on the tentative price for the Paper, the proposed transaction was submitted to Ekman AB for both a profitability analysis and a credit analysis. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 115 ln. 20 – p. 116 ln. 23; p. 37 ln. 25 – p. 38 ln. 5)].

26. Graphic submitted the proposed transaction to Ekman AB as a purchase order. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 38 ln. 3-5)].

27. Once a proposed transaction was satisfactory to Ekman AB, Ekman AB would send its purchase order to Great Champ. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 38 ln. 3-5; p. 45 ln. 16 – p. 46 ln. 16)].

28. If it accepted the order, Great Champ would then send a sales confirmation to Ekman AB. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 38 ln. 7-10)].

29. Once Ekman AB received the sales confirmation from Great Champ, Ekman AB issued a sales confirmation, also called a "sales order," to Graphic. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 38 ln. 7-10)].

30. The "sales order" stated the tentative purchase price for the paper ordered, which was subject to later change due to factors such as the exact quantity of paper which could be loaded aboard the eventual transport vessel. [Decl. of Anthony J. Costantini, Ex. B].

31. The sales orders also specified (i) that Graphic was to pay Ekman AB within 90 days after a bill of lading was issued for the Paper, and (ii) that late payments (i.e., after 90 days) would be subject to an annual penalty interest rate of 12%. [Decl. of Anthony J. Costantini, Ex. B].

32. Ekman AB requested that Graphic acknowledge the terms of the sales order. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 38 ln. 12-16)].

33. In order to provide that acknowledgment, Christopher Cummings, a 13-year employee of Graphic who was responsible for inventory control and inventory management, signed the sales orders and returned them to Ekman AB. [Decl. of Anthony J. Costantini, Ex. B, Ex. G (Dep. of Rosane Guterro, p. 169 ln. 5-17), Ex. J (Dep. of Leonard Aronica, p. 65 ln. 6-13)].

34. Once the Paper was ready for shipment, Great Champ would issue an invoice to Ekman AB reflecting the final quantity and cost of Paper to be shipped. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 11 ln. 7-14; p. 103 ln. 8-11)].

35. When the Paper was loaded aboard ship, Great Champ received a bill of lading and a certificate of origin and presented these documents and a ream of other documents (packing lists, container lists, etc.) to Ekman AB's bank in Sweden as proof that it had fulfilled its contract with Ekman AB. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 54 ln. 6-25; p. 18 ln. 2-4)].

36. If all this documentation was in order, Ekman AB would approve Great Champ's invoice for payment long before the vessel arrived in the United States. Ekman AB's bank would promptly wire transfer full payment to Great Champ, which had no continuing responsibility in the transaction, save for addressing any complaints related to the quality of the Paper that had been delivered. [Decl. of Anthony J. Costantini, Ex. D, Ex. G (Dep. of Rosane Guterro, p. 114 ln. 5-11; p. 161 ln. 2-6; p. 55 ln. 19 – p. 56 ln. 3), Ex. M (Dkt. 1, Ex. B)].

37. Upon its payment of the invoice from Great Champ, Ekman AB would issue its own invoice directly to Graphic reflecting the final quantity and cost of Paper to be shipped. [Dep. of Rosane Guterro, p. 161 ln. 10-18].

38. Neither Graphic or Ekman AB paid Paper Max for its role in the transactions. [Decl. of Anthony J. Costantini, Ex. M (Dkt. No. 1, Ex. B, ¶ 11)].

39. Paper Max's only compensation for its involvement in the transactions was the commission it received from Great Champ. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 42 ln. 20 – p. 43 ln. 17), Ex. J (Dep. of Leonard Aronica, p. 65 ln. 6-13) Ex. N (Aff. of Tim Sung)].

40. When the Paper was ready for delivery, Great Champ arranged for it to be loaded aboard ship in Asia. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 51 ln. 13-21; p. 156 ln. 4-9; p. 38 ln. 6-10; p. 39 ln. 25 – p. 40 ln. 13)].

41. Typically, the transportation of the Paper from Asia to New York would take ten to twelve weeks. [Decl. of Anthony J. Costantini, Exs. J (Dep. of Leonard Aronica, p. 224 ln. 13-16)].

42. While the transport vessel was usually chosen by Great Champ or Paper Max, it (and the concomitant freight charges) had to meet with Ekman AB's approval. [Decl. of

7

Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 136 ln. 22 – p. 137 ln. 5, p. 140 ln. 13 - p. 141 ln. 15)]

43. Upon completion of each voyage, Ekman AB paid the shipper directly for its services and caused payment to be made to a customs agent, FedEx Trade Networks, to facilitate the processing of the Paper through U.S. Customs. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 78 ln. 7-23, p. 123 ln. 1 – 21)].

44. Ekman AB would consign the Paper to Paper Max during customs clearance, and FedEx Trade Networks would process the Paper on Paper Max's behalf. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 77 ln. 21 – p. 78 ln. 23, p. 122 ln. 21-22)].

45. It is not unusual for the owner of goods to consign those goods to another party for purposes of customs clearance. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 54 ln. 18-24, p. 59 ln. 17 - p. 60 ln. 5), Ex. H (Dep. of James Peiffer, p. 70 ln. 15 – p. 71 ln. 3)].

46. At all times between the loading of the Paper onboard the freight vessel and the delivery of the Paper to Graphic, Ekman AB retained title to the Paper and, in the event of loss of or damage to the Paper or non-payment by Graphic, was solely responsible for the resultant financial loss. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 59, ln. 17-20), Ex. G (Dep. of Rosane Guterro, p. 122 ln. 23 – p. 123 ln. 23, p. 114 ln. 10-11, p. 180 ln. 7-11), Ex. H (Dep. of James Peiffer, p. 18 ln. 2-12, p. 19 ln. 2-6, p. 71 ln. 1 – p. 72 ln. 20)].

47. Paper Max would pay FedEx Trade Networks for its custom clearance activities, and Ekman AB reimbursed Paper Max for its payments to FedEx Trade Networks; these reimbursements were somewhat minimal (estimated at less than 1% of the value of the transaction), and there are no obligations owing from Ekman AB to Paper Max. [Decl. of

Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 64, ln. 7-14), Ex. G (Dep. of Rosane Guterro, p. 186 ln. 15-23)].

48. Great Champ was paid in full shortly after the Paper was loaded on board ship in Asia. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 114 ln. 5-11, p. 123 ln. 22-25), Ex. M (Dkt. 1, Ex. B, ¶ 9)].

49. Ekman AB thus bore all risks of loss during the entirety of the voyage, up to and including delivery to Graphic - - a process that takes several weeks. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 114 ln. 10-11, p. 180 ln. 7-11), Ex. I (Dep. of Johanna Segerberg, p. 18 ln. 7-11)].

50. Once title was transferred to Graphic upon delivery to Graphic's facility in New York, Ekman AB bore the credit risk for the Paper until Graphic paid Ekman AB. [Decl. of Anthony J. Costantini, Ex. G (Dep. of Rosane Guterro, p. 200, ln. 7-20), Ex. H (Dep. of James Peiffer, p. 18 ln. 2-12)].

51. Ekman AB has no agreement with anyone else involved in the transaction for any kind of indemnification or guarantee, and has never asked or demanded of any party to the transaction other than Graphic that Ekman AB be made whole for Graphic's failure to pay. Ekman AB remained responsible for all costs - - freight, insurance, customs, etc. - - whether or not it was paid by Graphic, and all these costs were paid by Ekman AB even though Ekman AB went unpaid by Graphic. [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p. 18 ln. 2-12, p. 19 ln. 2-6), Ex. M (Dkt. No. 1, Ex. B)].

52. No one other than Ekman AB had an interest in the Paper between the time that it was loaded aboard the transport vessel and the time of its delivery to Graphic, and no one other than Ekman AB had an interest in the debts created when delivery was made to Graphic. [Decl.

9

of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 81, ln. 2-23), Ex. H (Dep. of James Peiffer, p. 18 ln. 2-12, p. 19 ln. 2-6), Ex. M (Dkt. No. 1, Ex. B)].

### The Restraining Notice

53.     In August 2010, U.S. Bank served a Restraining Notice on Graphic.  [Decl. of Anthony J. Costantini, Ex. L (Dkt. No. 1, Ex. A)].

54.     The Restraining Notice was limited to the debts Graphic might owe to and property it might hold for five named Judgment Debtors: APP International Finance Co., P.T. Lontar Papyrus Pulp & Paper Industry, Asia Pulp & Paper Co. Ltd, Indah Kiat International Finance Co., B.V., and Indah Kiat Pulp & Paper Corp. (collectively the "Judgment Debtors" and each a "Judgment Debtor"), and made no mention of affiliates, agents, employees, etc.  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-9, M-10), Ex. L (Dkt. No. 1, Ex. A)].

55.     An accompanying subpoena was more extensive, mentioning Paper Max by name (together with nearly one hundred other entities).  [Decl. of Anthony J. Costantini, Ex. L (Dkt. No. 1, Ex. A)].

56.     Ekman AB is neither controlled by nor affiliated with any of these Judgment Debtors or the associated entities named in the subpoena.  [Decl. of Anthony J. Costantini, Ex. M (Dkt. 1, Ex. B, ¶¶ 6-7)].

57.     There is no evidence that anyone from Ekman AB ever agreed, conspired, or colluded with anyone from the Judgment Debtors to help any of the Judgment Debtors to evade judgments of U.S. courts.  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau); Ex. F (Dep. of Tim Sung); Ex. G (Dep. of Rosane Guterro); Ex. H (Dep. of James Peiffer); Ex. I (Dep. of Johanna Segerberg); Ex. J (Dep. of Leonard Aronica); Ex. K (Dep. of Hans Tidebrant)].

58. The Restraining Notice did not specify the debts Graphic owed to Ekman AB, and the Restraining Notice was never amended or re-served.  [Decl. of Anthony J. Costantini, Ex. L (Dkt. No. 1, Ex. A)].

59. Despite the fact that no mention was made of this debt or of Ekman AB, Graphic notified Ekman AB that it was afraid that it might be sued by U.S. Bank if the debt were paid, saying that it was concerned about possible Judgment Debtor involvement because of its belief that the mills that were the ultimate supplier of the product were owned or controlled by one or more of the Judgment Debtors.  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-1, M-5), Ex. J (Dep. of Leonard Aronica, p. 213 ln. 23 – p. 214 ln. 11)].

60. Notwithstanding Graphic's stated fear that monies owed to Ekman AB might be subject to the Restraining Notice, Graphic's counsel had, by August 24, 2010, confirmed with counsel for U.S. Bank that the Restraining Notice restrained only "(i) any asset owed by Graphic to any judgment debtor in this action ('Judgment Debtor'); (ii) any asset of any Judgment Debtor in the possession, custody or control of Graphic; or (iii) any asset of any Judgment Debtor to which Graphic is entitled."  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-9, M-10)].

61. Ekman AB was in possession of no information establishing that Paper Max or Great Champ were affiliated with any Judgment Debtor, and extensive inquiries about Great Champ failed to turn up any evidence of affiliation with any Judgment Debtor. [Decl. of Anthony J. Costantini, Ex. H (Dep. of James Peiffer, p.46 ln. 13-22, p.36 ln. 22 – p. 37 ln. 9, p. 57 ln. 4 – p. 58 ln. 22), Ex. M (Dkt. No. 1, Ex. B)].

62. In order to assuage Graphic's concerns, Ekman AB provided information at Graphic's request demonstrating that it was not affiliated with Paper Max, Great Champ, or any

of the Judgment Debtors, that it had no knowledge that Great Champ was so affiliated, that it paid Great Champ in full for the product long before it reached the shores of the United States, and that no other person or entity had an interest in the debt owed by Graphic to Ekman AB (the "Graphic Debt"). [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-4, M-7)].

63. Graphic's counsel drafted an affidavit addressing all these points, which was subsequently signed by Hans Tidebrant, Ekman AB's senior vice-president, on September 2, 2010 (the "Tidebrant Affidavit"). [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-12, M-14, M-18), Ex. K (Dep. of Hans Tidebrant, p. 7, ln. 16-23), Ex. M (Dkt. No. 1, Ex. B)].

64. After the Tidebrant Affidavit was drafted as required by Graphic's counsel, it was transmitted to Graphic on September 17, 2010 in reliance on Graphic's promise to pay the Graphic Debt once Graphic received a similarly satisfactory Affidavit from Paper Max. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-48, M-51)].

65. Graphic and Paper Max repeatedly discussed the form of affidavit to be provided by Paper Max. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-12, M-29, M-59)].

66. Tim Sung, while not an officer of Paper Max, was the most knowledgeable Paper Max representative with respect to the Graphic transactions. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, M-69)].

67. Graphic ultimately indicated that, for purposes of resuming payments to Ekman AB, it would be sufficient for Paper Max to provide an affidavit by Tim Sung, along with a corporate resolution addressing ownership issues and both authorizing and affirming Mr. Sung's

affidavit (together, the "Sung Affidavit"). [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-12, M-29, M-59, M-68)].

68. Paper Max provided an executed copy of the Sung Affidavit. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Ex M-69)].

69. Both the Tidebrant Affidavit and the Sung Affidavit were drafted by <u>Graphic's counsel</u> with input from counsel for Ekman AB and Paper Max, respectively. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-13, M-17, M-18, M-19, M-22, M-23, M-27, M-29, M-30, M-40, M-64)].

70. The Sung Affidavit was delivered in October of 2010. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Ex. M-68)].

71. Despite agreeing to pay the Graphic Debt if the affidavits its counsel had drafted were executed, Graphic refused to resume payments to Ekman AB. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-73, M-81)].

72. This refusal came after Graphic's counsel had communicated with U.S. Bank's counsel at the end of the first week of October, at which time U.S. Bank's counsel refused to agree to refrain from suit against Graphic if Graphic paid Ekman AB and advised Graphic to file for interpleader. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Ex. M-67)].

73. Graphic has no knowledge that any part of the Tidebrant Affidavit is incorrect. [Decl. of Anthony J. Costantini, Ex. J (Dep. of Leonard Aronica, p. 204 ln. 5-12)].

74. Graphic has no knowledge that any part of the Sung Affidavit is incorrect. [Decl. of Anthony J. Costantini, Ex. F (Dep. of Tim Sung, p. 149 ln. 3-11), Ex. J (Dep. of Leonard Aronica, p. 216 ln. 17 – p. 217 ln. 19)].

75. Apparently afraid that U.S. Bank would sue, no matter how much due diligence was done, Graphic renounced its prior agreement and refused to pay the Graphic Debt despite the fact that both Ekman AB and Paper Max had furnished the affidavits requested. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Ex M-48, M-73)].

76. Ekman AB had previously indicated to Graphic that Ekman AB would sue Graphic if Graphic did not resume payment to Ekman AB. [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-8, M-71, M-75)].

77. This action was instituted on October 25, 2010. At that time, Graphic owed Ekman AB past-due payments in the principal amount of $1,905,885.33. [Dkt. No. 1].

78. On November 18, 2010, Graphic answered Ekman AB's complaint and filed for interpleader against Ekman AB and U.S. Bank. [Dkt. No. 6].

79. It was not until December 10, 2010 that Graphic deposited the interpleader stake of $1,905,885.33 into the registry of this Court. [Dkt.].

80. Even now, Graphic refuses to deposit the full amount of contractual interest on the interpleaded stake. [Dkt. No. 41].

81. On May 5, 2011, Graphic deposited $31,517.21 representing some of the interest accrued on the $1,905,885.33 principal into the registry of the Court. [Dkt.].

82. On June 21, 2011, the Court so-ordered a stipulation that Graphic be permitted to withdraw its deposit of $31,517.21 of accrued interest. [Dkt. No. 41].

83. To date, Graphic has never withdrawn its deposit of $31,517.21 of accrued interest. [Dkt. No. 1, ¶ 59].

84. As of January 10, 2012, the full amount of interest owed by Graphic on the interpleader stake at the contractual interest rate of 12% is $68,425.19.  [Decl. of Anthony J. Costantini, ¶ 5].

85. In addition to $62,966.70 in pre-escrow interest on the principal amount of $1,905,885.33, the sum of $68,425.19 includes an additional $5,458.49 of interest on undeposited interest accrued as of January 10, 2012.  [Decl. of Anthony J. Costantini, ¶ 5].

86. Ekman AB subsequently offered to indemnify Graphic for any losses incurred if Graphic were to pay the Graphic Debt to Ekman AB.  [Decl. of Anthony J. Costantini, ¶¶ 2-3].

87. Graphic refused this offer of loss indemnification.  [Decl. of Anthony J. Costantini, ¶ 4].

## The Diverted Goods

88. While Ekman AB and Graphic negotiated over the resumption of Graphic's payments to Ekman AB, several shipments of the Paper were en route for delivery to Graphic pursuant to orders previously placed by Graphic with Ekman AB.  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-8, M-11)].

89. Ekman AB made clear to Graphic, on several occasions, that no further deliveries of the Paper would be made until Graphic had resumed making payments to Ekman AB.  [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-8, M-11, M-23, M-24, M-26, M-31, M-34)].

90. Furthermore, Ekman AB stated that if Graphic did not promptly resume payment, Ekman AB would seek to re-sell the undelivered Paper (hereinafter, the "Diverted Goods"). [Decl. of Anthony J. Costantini, Ex. E (Dep. of Joel Morgenthau, Exs. M-8, M-11, M-23, M-24, M-26, M-31, M-34]; [Decl. of Anthony J. Costantini, ¶ 6].

91. During the pendency of this action, Ekman AB has in fact resold the full Diverted Goods to various purchasers. [Decl. of Anthony J. Costantini, ¶ 7].

92. Ekman AB received $522,401.25 for the Diverted Goods, which was initially to be sold to Graphic at a contract price of $558,440.72, resulting in a loss of $36,039.47. [Decl. of Anthony J. Costantini, Ex. C].

93. Additionally, Ekman AB incurred incidental damages of $40,868.14 due to the cost of insuring, storing, and transporting the Diverted Goods to the eventual purchasers. [Decl. of Anthony J. Costantini, Ex. C].

## The Dismissed Claims

94. By its Order of April 14, 2011, the Court dismissed Graphic's counterclaim for a proceeding to determine adverse claims pursuant to N.Y. CPLR § 5239, without prejudice. [Dkt. 28].

95. By its Order of June 21, 2011, the Court dismissed Graphic's counterclaim for statutory interpleader pursuant to 28 U.S.C. § 1335, without prejudice. [Dkt. 41].

Dated: January 18, 2012
      New York, New York

DUANE MORRIS LLP

By:   /s/ Anthony J. Costantini
      Anthony J. Costantini, Esq.
      ajcostantini@duanemorris.com
      Mairi V. Luce, Esq.
      luce@duanemorris.com
      Keith D. Greenberg, Esq.
      kdgreenberg@duanemorris.com
1540 Broadway
New York, NY 10036
(212) 692-1000
*Attorneys for Plaintiff-Interpleader Defendant Ekman & Co AB*

TO: Gary Ettelman, Esq.
Joshua Stern, Esq.
Ettelman & Hochheiser, P.C.
Suite 401
100 Quentin Roosevelt Boulevard
Garden City NY  11530
*Counsel for Defendant-Interpleader*
*Plaintiff Graphic Paper, Inc.*


Joseph Zelmanovitz, Esq.
Jessica Taran, Esq.
Wilk Auslander LLP
1515 Broadway
43rd Floor
New York, NY 10036
*Counsel for Interpleader Defendant*
*U.S. Bank, N.A.*